RESOLUTION TRUST CORPORATION, in its corporate capacity, Plaintiff,

v.

KPMG PEAT MARWICK, Peat Marwick Main & Co., Peat, Marwick, Mitchell & Co., and Ronald L. Friske, Defendants.

No. 93 C 0108.

United States District Court, N.D. Illinois, E.D.

Feb. 25, 1994.

Michael Allen Childers, S.E.C., Fay Clayton, Steven A. Ramirez, Robinson, Curley & Clayton, P.C., Chicago, IL, Steven A. Hammond, Jeffrey R. Coleman, Hughes, Hubbard & Reed, New York City, for plaintiff.

Robert D. McLean, Melville Willis Washburn, Linton Jeffries Childs, Jeffrey R. Tone, Sidley & Austin, Chicago, IL, for defendants.

## MEMORANDUM OPINION AND ORDER

ALESIA, District Judge.

The Resolution Trust Corporation ("RTC") filed its Complaint to recover an amount alleged to be in excess of $50 million in

compensatory damages from KPMG Peat Marwick, Peat Marwick Main & Co., Peat, Marwick, Mitchell & Co., and Ronald L. Friske ("Peat Marwick") arising out of Peat Marwick's auditing Horizon Federal Savings Bank (formerly First Federal Savings and Loan Association of Wilmette) ("Horizon") for the year ended December 31, 1982, and periods ended August 31, 1983, through August 31, 1988. The Complaint asserts four claims for relief: negligence, negligent misrepresentation, breach of fiduciary duty, and breach of contract. By order dated February 17, 1994, this court dismissed the claims for relief sounding in negligence and breach of fiduciary duty.

Peat Marwick's Answer contains ten affirmative defenses, of which the following six are in dispute:

2. Plaintiff's claims are barred by the doctrine of estoppel, waiver, and laches.

3. Plaintiff's claims are barred or diminished by its own sole or contributory negligence and assumption of risk.

4. Plaintiff's claims are barred by the doctrine of inequitable conduct, unclean hands, and *in pari delicto*.

5. Plaintiff's claims are barred or diminished by its failure to mitigate damages.

7. Plaintiff's claims are barred or diminished by the doctrines of causation in fact, proximate cause, intervening cause, supervening events and impossibility of performance.

8. Plaintiff's claims are barred or diminished by Peat Marwick's reasonable reliance upon the decisions and actions of government agencies, plaintiff's officers, directors, employees and agents; the officers, directors, employees and agents of its audits clients; appraisals; business advisors; borrowers; accountants; attorneys; and others.

The RTC now moves to strike the above affirmative defenses under Federal Rule of Civil Procedure 12(f).

Rule 12(f) states that "the court may order stricken from any pleading any insufficient defense." FED.R.CIV.P. 12(f). An affirmative defense may be stricken if it is insufficient as a matter of law. *In re Sunrise Sec.*

*Litig.*, 818 F.Supp. 830, 840 (E.D.Pa.1993). "An affirmative defense is insufficient if as a matter of law it cannot succeed under any circumstances." *Id.*

## I. *Affirmative Defenses 3 and 5*

Defense 3 is that "[p]laintiff's claims are barred or diminished by *its own* sole or contributory negligence and assumption of risk." Defense 5 is that "[p]laintiff's claims are barred or diminished by *its* failure to mitigate damages." (emphases added) Defendants' sweeping statement that "Peat Marwick's defenses relate to the pre-receivership conduct of Horizon Federal Savings Bank ("Horizon"), in whose shoes, the RTC, as receiver stands" (Defendants' Memorandum in Opposition to Plaintiff's Motion to Strike Affirmative Defenses at 2), is simply untrue by the plain language of Defenses 3 and 5. The referent of the word "its" in those defenses could only be the word "Plaintiff's." And the "Plaintiff" here is "Resolution Trust Corporation, in its corporate capacity."

Defendants concede much ground based on their reading of their affirmative defenses, choosing to concentrate primarily on arguing that the RTC, having stepped into the shoes of Horizon, is susceptible to all affirmative defenses to which Horizon was susceptible. That argument is considered below as to those defenses to which it is relevant. On Defenses 3 and 5, it is only relevant whether the *RTC's* contributory negligence and failure to mitigate damages may be pleaded by defendants as affirmative defenses. The Seventh Circuit has answered that question—these affirmative defenses may not be asserted against the RTC regarding the RTC's conduct. *FDIC v. Bierman*, 2 F.3d 1424, 1438–41 (7th Cir.1993). The *Bierman* decision is discussed more fully below in considering whether to extend its analysis to defenses asserted against the institution of which the RTC has assumed claims.

## II. *Affirmative Defenses 2, 4 and 8*

Defenses 2, 4 and 8 appear for the most part to go to the pre-receivership conduct of Horizon, and not to the actions of the RTC itself. Thus the question before the

court as to these defenses is whether to treat the RTC as a normal receiver, subject to any defenses that could be asserted against the entity in receivership, or to instead consider the RTC exempt from these defenses due to its special nature as an instrumentality of the United States. The Seventh Circuit's *Bierman* case provides guidance.

In *Bierman,* the Seventh Circuit considered the question of "whether the FDIC, when it sues former officers and directors in its corporate capacity to recover losses sustained by the insolvent bank and covered by its insurance fund, may be subject to the affirmative defense of failure to mitigate those losses." *Bierman,* 2 F.3d at 1428. The court analyzed the policies underlying the creation and empowerment of the FDIC. The court specifically noted that the FDIC was established by Congress to promote stability and confidence in the banking system by insuring bank depositors, supervising banks, and assisting in the event of a bank failure. *Id.*

The court cited with approval a number of opinions detailing the special public policy role of the FDIC. The court stated that " '[p]ublic policy concerns mandate a finding that the duty of FDIC to collect on assets of a failed institution runs to the public and not to the former officers and directors of the failed institution.' " *Id.* (quoting *FDIC v. Greenwood,* 719 F.Supp. 749, 751 (C.D.Ill. 1989)). The court continued to stress the public policy concerns underlying the banking laws:

> "FSLIC owes no duty to those institutions or to those whose negligence has brought them to the brink of disaster. Self-evidently, it is the public which is the intended beneficiary of FSLIC, just as it is the public which is the beneficiary of the common law duty imposed upon officers and directors to manage properly the institutions entrusted to their care. Thus nothing could be more paradoxical or contrary to sound policy than to hold that it is the public which must bear the risk of errors of judgment made by its officials in attempting to save a failing institution—a risk which would never have been created

but for defendants' wrongdoing in the first instance."

*Bierman,* 2 F.3d at 1428 (quoting *FSLIC v. Roy,* No. JFM–87–1227, 1988 WL 96570, at *1, 1988 U.S.Dist. LEXIS 6840, at *4 (D.Md. June 28, 1988)). The court went on to emphasize that public policy concerns are the principal factor in construing and applying the banking laws:

> "The rule that there is no duty owed to the institution or wrongdoers by the FSLIC/Receiver is simply a means of expressing the broad public policy that the banking laws creating the FSLIC and prescribing its duties are directed to the public good, and that every separate act of the FSLIC as a receiver in collecting assets is not open to second guessing in actions to recover damages from wrongdoing directors and officers.
>
> . . . .
>
> The affirmative defenses at issue should be struck, as these defenses would require the public to bear the possible errors of judgment by the FSLIC as receiver rather than the persons found to be guilty of wrongdoing, and removing these defenses will help the court and the jury focus on the real issues presented in the pleadings."

*Bierman,* 2 F.3d at 1438–39 (quoting *FSLIC v. Burdette,* 718 F.Supp. 649, 663–64 (E.D.Tenn.1989)).

Based on the aforementioned public policy concerns, it is clear that the portion of Defense 8 referring to Peat Marwick's reliance on the actions "of government agencies" must be struck. The question still remains whether the public policy concerns prohibiting affirmative defenses based on the conduct of government agencies applies to affirmative defenses asserted against government agencies not based on the actions of the government agency itself, but on the prereceivership activities of the entity now in receivership. The Seventh Circuit did recognize a distinction between the question here and the question presented in *Bierman. Bierman,* 2 F.3d at 1439 n. 17. While the court rejected the assertion that the FDIC in its corporate capacity falls outside the public policy concerns, it did not squarely decide the question of whether those public policy

concerns apply with equal weight when the FDIC sues a third party. The circuits are split on this issue.[1]

■ In *FDIC v. O'Melveny & Meyers* [sic], 969 F.2d 744 (9th Cir.1992), *cert. granted,* —— U.S. ——, 114 S.Ct. 543, 126 L.Ed.2d 445 (1993), the Ninth Circuit held that affirmative defenses based on the pre-receivership conduct of the entity in receivership could not be asserted by a third party against the FDIC. The court reasoned as follows:

A receiver, like a bankruptcy trustee and unlike a normal successor in interest, does not voluntarily step into the shoes of the bank; it is thrust into those shoes. It was neither a party to the original inequitable conduct nor is it in a position to take action prior to assuming the bank's assets to cure any associated defects or force the bank to pay for incurable defects. This places the receiver in stark contrast to the normal successor in interest who voluntarily purchases a bank or its assets and can adjust the purchase price for the diminished value of the bank's assets due to their associated equitable defenses. In such cases, the bank receives less consideration for its assets because of its inequitable conduct, thus bearing the cost of its own wrong.

Also significant is the fact that the receiver becomes the bank's successor as part of an intricate regulatory scheme designed to protect the interests of third parties who also were not privy to the bank's inequitable conduct. That scheme would be frustrated by imputing the bank's inequitable conduct to the receiver, thereby diminishing the value of the asset pool held by the receiver and limiting the receiver's discretion in disposing of the assets.

In light of these considerations, we conclude that the equities between a party asserting an equitable defense and a bank are at such variance with the equities between the party and a receiver of the bank that equitable defenses good against the

bank should not be available against the receiver. To hold otherwise would be to elevate form over substance—something courts sitting in equity traditionally will not do.

*FDIC v. O'Melveny & Meyers,* 969 F.2d at 751–52 (citations omitted).

The Fifth Circuit in *FDIC v. Ernst & Young,* 967 F.2d 166 (5th Cir.1992), reached a contrary result. The court found that the most significant factor in that case was the FDIC's decision to sue only as an assignee of the failed institution. *Id.* at 169. The court recognized that strong federal policy indicates that the FDIC as corporate insurer takes greater rights than a failed bank, but that these rights are limited in scope and do not apply when the FDIC sues as an assignee. *Id.* at 169–70.

The District of Kansas rejected this result in *Comeau v. Rupp,* 810 F.Supp. 1127 (D.Kan.1992). The court reasoned that the result of treating the FDIC as simply another assignee or stockholder would be that "the public would be made to pay for wrongs that it was in no real position to prevent.... Such a policy would defeat rather than further the tort principle of compensating the victim, while doing nothing either to deter culpable parties from refraining from tortious conduct, or to encourage the shareholders to employ more trustworthy corporate managers." *Id.* at 1142. The court also addressed the equities (or inequities) of taking a defense normally available away from a third party:

The [third party] seek[s] to impute the [failed institution's officer's] conduct to the FDIC for two reasons: (1) to set up the defense of contributory negligence to their own negligence as alleged by the FDIC, and (2) to obtain indemnity from the FDIC in the event that they are found liable to the [failed institution]. In either case, the relief sought by the [third party] would come into play only upon plaintiff's initial showing of some culpable conduct on the part of the [third party]. But by imputing to FDIC the torts of [failed institution's]

---

1. The Supreme Court may resolve the issue in the not too distant future. *O'Melveny & Myers v. FDIC,* —— U.S. ——, 114 S.Ct. 543, 126 L.Ed.2d

445 (1993). Nonetheless, *certiorari* having been granted only last November, it still makes sense for this court to rule today.

officers, the [third party] would shift their liability for plaintiff's losses to the FDIC. Thus this is not a case where a wholly innocent party will be called upon to pay for a loss caused by another. To the contrary, allowing the FDIC to disavow the wrongful acts of [the failed institution's] former officers prevents *culpable* parties from transferring liability for their tortious conduct to an entity that is indisputably without fault in bringing about [the failed institution's] losses: the public, in the person of the FDIC.

*Id.* (citation and footnote omitted); *see also FDIC v. Benjes*, 815 F.Supp. 1415 (D.Kan. 1993) (adopting same rationale); *In re Sunrise Sec. Litig.*, 818 F.Supp. at 843–44 (striking affirmative defenses based on estoppel and *in pari delicto*, adopting the same public policy rationale).

The above reasoning leads this court to conclude that Defenses 2, 4 and 8 [2] should be stricken as they all attempt to divert the costs of liability away from an allegedly culpable party to the public. The RTC, created to contain the damage caused by the numerous failures of financial institutions, should not be treated as the same as an ordinary party when it attempts to recover from an allegedly culpable party, even if other potentially culpable parties were involved.

### III. *Affirmative Defense 7*

 With regard to Defense 7, the court finds the reasoning in *RTC v. Farmer*, 823 F.Supp. 302, 314 (E.D.Pa.1993), relating to these defenses persuasive:

A defendant is liable only for the damages which it has proximately caused.... Here, what defendants label an affirmative defense is actually only an assertion that RTC cannot prove proximate cause.... Accordingly, defendants' styled affirmative defenses of lack of proximate cause are stricken as to plaintiff.

*Id.* The defendants are free to assert at trial that their actions were not the proximate cause of Horizon's losses. But an assertion

of this type is not an affirmative defense; it is an assertion that RTC cannot prove a necessary element of its claim. To the extent Defense 7's assertion of "impossibility of performance" states a separate defense, it is too conclusory to provide adequate notice even under liberal pleading standards. *See Heller Financial, Inc. v. Midwhey Powder Co.*, 883 F.2d 1286, 1295 (7th Cir.1989).

### CONCLUSION

Accordingly, plaintiff's Motion to Strike Affirmative Defenses Two, Three, Four, Five, Seven and Eight from Defendants' Answer is granted. Said affirmative defenses are stricken.

---

**2.** Defense 8 is not a model of clarity. To an extent, it suffers from the same problem as Defense 3 and 5, namely a reference that suggests it is the RTC's conduct that is the basis of the

defense. Defense 8 is vague and ambiguous on this point, which is an independent reason to strike the defense pursuant to Rule 12(f).